UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN ANDREW HOWELL,

                    Petitioner,                    Case No. 1:19-cv-446

v.                                                         Honorable Robert J. Jonker

LES PARISH,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C.
§ 2254.  When Petitioner John Andrew Howell filed his petition, he was incarcerated
with the Michigan Department of Corrections at the Oaks Correctional Facility (ECF)
in Manistee, Manistee County, Michigan.  He has since been released on parole.  See
https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=927313    (visited
March 4, 2021).  On March 3, 2014, following a four-day jury trial in the Chippewa
County Circuit Court, Petitioner was convicted of first-degree criminal sexual conduct
(CSC-I), in violation of Mich. Comp. Laws § 750.520b, and indecent exposure, in
violation of Mich. Comp. Laws § 750.335a.  On September 5, 2014, the court sentenced
Petitioner to concurrent prison terms of 5 years, 10 months to 50 years for CSC-I and
365 days for indecent exposure.

On June 5, 2019, Petitioner timely filed his habeas corpus petition raising three grounds for relief, as follows:

I.    The trial judge reversibly erred and violated Mr. Howell's due process rights by allowing Detective Harp to testify regarding "delayed disclosure."  In the alternative, trial counsel was ineffective for failing to object to Detective Harp's testimony and for failing to call an expert to consult with and testify to rebut this erroneous testimony.

II.   The prosecution violated Mr. Howell's right to due process and a fair trial when it failed to disclose exculpatory and impeachment evidence related to two key prosecution witnesses.  Alternatively, trial counsel was ineffective for failing to investigate these witnesses.

III.  The prosecutor violated Mr. Howell's due process rights during closing argument by making an improper civic duty argument, vouching for the complainant's credibility, and by improperly shifting the burden of proof.  Alternatively trial counsel was constitutionally ineffective for failing to object to the prosecutor's improper argument.

(Pet'r's Br., ECF No. 2, PageID.26.)  Respondent has filed an answer to the petition (ECF No. 6) stating that the grounds should be denied because they are non-cognizable, procedurally defaulted, meritless, or any error was harmless.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.     Factual allegations

The Michigan Court of Appeals described the facts underlying Petitioner's

convictions as follows:

> Defendant was accused of having sexual relations with complainant and attempting to have sexual relations with another adolescent, BH, a charge for which he was acquitted, while he was a middle school teacher at the school complainant and BH attended. Defendant was also accused of indecent exposure for having pulled down his pants in front of adolescents HC, MV and ML one New Year's Eve. There was testimony indicating that complainant, HC, MV and BH would spend time at defendant's home, as they were all friends with ML, the daughter of the woman with whom defendant had a relationship. (Hereinafter referred to as "the mother"). According to testimony at trial, defendant would provide the girls with alcohol and marijuana. Testimony also revealed that defendant drank alcohol and smoked marijuana with the girls on at least one occasion, and had four of the adolescents in his car on one occasion when he purchased and sold marijuana.

> BH testified that on one occasion defendant inappropriately asked her if she "would suck his dick." She further stated that she drank alcohol that he provided, that she had seen him intoxicated and involved with marijuana, and that she had smoked marijuana in his car. She testified that on another occasion he drew "I want you" on her shoulder, and that on yet another occasion he "was really drunk and he took all his clothes off" in front of her and ML.

> Complainant testified that defendant acted "[i]n a more sexual way" with her compared to how he treated the other girls. She testified she had an addiction to marijuana, that defendant gave her money to buy marijuana, and that she had purchased marijuana for him before. Complainant testified that on a date she could not recall, defendant had been drinking alcohol and kissed her on the lips, and that she and defendant had sex that night. She testified that prior to sex, defendant had given her alcohol and he then awakened her after she had gone to sleep in the living room with ML and MV, saying that he wanted to talk about "how cool I am and how he liked me." She testified that they went to the bedroom, that defendant and another man in the bedroom named "Key" asked her "to strip" and then all three did so, and that she was then bent over the bed and defendant "stuck his penis" in her vagina

3

while Key put his penis in her mouth.  She testified, "I let it go on for a few more minutes and then I told them to stop—that I wanted to go outside."  Complainant did not tell anyone about the incident right away and stated that when it happened she "didn't care" because "I didn't have enough respect for myself."

Complainant met with Detective Tom Swanson on February 22, 2013 and told him that nothing inappropriate happened involving defendant and another male.  However, Detective Darrell Harp interviewed complainant in June 2013 and she told him that she had sexual intercourse with defendant.  While testifying, Harp referred to complainant's late reporting as "delayed disclosure," explaining that he had been trained regarding victims involved in sexual assaults "[a]nd the sensitivity of the acts themselves," and stated that "[i]t's hard for them to come out with that.  The late reporting is common and I've experienced that with prior complaints."  Harp testified that complainant presented as a case of "delayed exposure [sic]",  consistent with what Harp had seen before.

At trial, defendant denied engaging in any inappropriate conduct with complainant and BH, and also denied that he had provided alcohol or marijuana for the girls.  He explained that on New Year's Eve, he was drunk and "mooned" his girlfriend, directing the "mooning" at her specifically because she had made a funny or joking comment.  He denied that the "mooning" was directed at the girls.  Defendant admitted that "some of the kids" had seen him in an intoxicated state and that it was inappropriate.  He denied taking any minor girls to hang out with him in his car.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1323–1324.)  "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)."  *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016).  Although Petitioner denies that the events described by the other witnesses occurred, his habeas challenges do not call into question the accuracy of the appellate court's description of the testimony.

Petitioner was initially charged with eleven crimes:  one count of CSC-I, four counts of accosting a child for immoral purposes, four counts of furnishing alcohol to a minor, and two counts of indecent exposure.  Only three counts—the CSC-I count, one count of accosting a child, and one count of indecent exposure—were put before the jury.  The Chippewa County Circuit Court Register of Actions indicates that the other eight counts were "NOP," dismissed by an Order of *Nolle Prosequi*.  (ECF No. 7-20, PageID.1342.)  The trial court record does not reflect the circumstances that prompted the dismissal.

The jurors began deliberations on the morning of March 3, 2014.  They returned their verdict that afternoon.  The jury found Petitioner guilty of CSC-I and indecent exposure, and not guilty of accosting a child for immoral purposes.

After the verdict, but before sentencing, Petitioner filed a motion for new trial.  (New Trial Mot. I Hr'g Tr., ECF No. 7-19.)  After sentencing, Petitioner filed another new trial motion and, in connection with that motion, the court conducted a *Ginther* hearing.[1]  (New Trial Mot. II Hr'g Tr., ECF No. 7-13; *Ginther* Hr'g Tr., ECF No. 7-14.)  The court denied both motions.

Petitioner appealed his convictions to the Michigan Court of Appeals, raising the same issues he raises in his habeas petition.  (Pet'r's Appeal Br., ECF No. 7-20, PageID.1446.)  By opinion issued July 13, 2017, the Michigan Court of Appeals

---

[1] In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

rejected Petitioner's challenges and affirmed the trial court.  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1323–1335.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court raising the same issues he raised in the court of appeals.  (Appl. for Leave to Appeal, ECF No. 7-21, PageID.1551.)  By order entered April 3, 2018, the Michigan Supreme Court denied leave to appeal.  (Mich. Order, ECF No. 7-21, PageID.1549.)

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

7

Determining whether a rule application was unreasonable depends on the rule's specificity.  *Stermer*, 959 F.3d at 721.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.  "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review.  The federal court is not free to consider any possible factual source.  The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).  "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can

review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Improper opinion testimony

Detective Darrell Harp investigated the crimes of which Petitioner was accused.  During June of 2013, he interviewed the victim and, at that time, she reported having sexual intercourse with Petitioner as described above.  During Detective Harp's direct examination, the following exchange occurred:

| | |
|---|---|
| Prosecutor: | Now the, the, with the time period, are you familiar with the term delayed disclosure? |
| Det. Harp: | Yes. |
| Prosecutor: | What does that mean? |
| Det. Harp: | We're actually training that victims of sexual assault . . . |
| | [Defense Counsel]: Judge, your Honor, may we approach. |
| | (at 9:53 a.m., bench conference) |
| | (At 9:54 a.m., court reconvened) |
| Prosecutor: | Continue with [delayed] disclosure.  Tell me about the training you've had? |
| Det. Harp: | We've had training that touched on victims involved in sexual assaults.  And the sensitivity of the acts themselves. |

9

> It's hard for them to come out with that.  The late reporting is common and I've experienced that with prior complaints.

Prosecutor:   And is this the case of delayed disclosure?

Det. Harp:   Yes.

Prosecutor:   And that's consistent with what you've seen before?

Det. Harp:   Yes.

(Trial Tr. IV, ECF No. 7-10, PageID.916–917.)

Petitioner contends that Detective Harp's testimony was improper because Harp was not an expert and because he opined on the credibility of the complaining witness—an issue reserved for the jury.  Petitioner argues the testimony should have been excluded and that counsel was ineffective because he failed to object.

Detective Harp was not qualified as an expert.  Indeed no expert testimony was admitted during Petitioner's trial.  Petitioner complains, in part, that Detective Harp's testimony was based on specialized knowledge and training and, thus, could only be offered through an expert.  Harp testified that his knowledge that sexual assault victims delay disclosure because of the sensitivity of the sexual acts was acquired during training.[2]

Under Michigan law, where specialized knowledge "will assist the jury to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion . . . ."  Mich. R. Evid. 702.  Petitioner complains that Harp was never offered or qualified as an expert.  Where the witness is not an expert, opinion

---

[2] He also testified that the knowledge was confirmed by his experience.

testimony is "limited to those opinions . . . which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Mich. R. Evid. 701. By implication, unless opinion evidence is admissible under Rule 701 or 702, evidence in the form of an opinion is simply not admissible.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction . . . [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Although the Michigan Court of Appeals only directly addressed whether or not Harp's testimony violated the Michigan Rules of Evidence—and never even mentioned the requirements of due process—the court never actually determined

11

that the admission of Detective Harp's "delayed disclosure" testimony violated Michigan Rule of Evidence 701 or 702.    (Mich. Ct. App. Op., ECF No. 7-20, PageID.1327–1328) ("[T]his line of questioning may have constituted error . . . . Whether commenting on 'delayed disclosure' requires expert testimony constitutes a close question . . . ."). The court "concur[red], to some extent, with plaintiff's argument that the testimony could be construed more an observation or lay opinion based on experience than an expert opinion based on specialized knowledge."    (*Id.*, PageID.1328.)  But the court simply left the question open.[3]

Instead of deciding whether admission of Harp's testimony violated the Rules of Evidence, the court of appeals concluded that any error did not prejudice Petitioner as required to meet the "plain error" standard of review:

> Even if we presume error, we cannot find from the record that error: ". . . resulted in the conviction of an actually innocent defendant or 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [citation and footnote omitted] . . . Accordingly, while it may have been plain error for the trial court to have allowed this testimony, we cannot find within the record that such testimony resulted in plain error affecting a substantial right.

(*Id.*)

---

[3] If the court of appeals determined that admission of the testimony violated the Michigan Rules of Evidence, or if the court determined that admission of the testimony did not violate the Michigan Rules of Evidence, that determination would bind this Court.  The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Ultimately, however, for the reasons stated below, whether or not admission of the testimony complied with state law is immaterial.

The court of appeals followed the same analytical path with regard to Petitioner's claim that Harp's testimony impermissibly bolstered the credibility of the claimant.  The court acknowledged the state's argument "that nothing in Harp's testimony was intended or actually bolstered the credibility of the victim[; r]ather, plaintiff argues, Harp was merely testifying about his observations, and his opinions formed by those observations."  (*Id.*)  Nonetheless, the court still concluded the issue presented "a close legal question."  (*Id.*)  Again, instead of deciding the claim, the court determined that even if it presumed error, Petitioner had not shown the necessary prejudice.  (*Id.*)

The court of appeals' determinations that the admission of Harp's testimony did not result in plain error affecting a substantial right under Michigan law is "analogous to a harmless-error analysis because [the court's] conclusion that the error did not affect the outcome of the case is another way of saying that the error was not harmful."  *Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016).  The Sixth Circuit Court of Appeals recently concluded that the proper habeas treatment of a state court's harmless error determination is not AEDPA deference, but *de novo* review to determine whether any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

In *Brecht*, the Supreme Court concluded that, for reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' "  *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).  Under the

*Brecht* test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.' "   *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 U.S. at 637 (internal quotation marks omitted).  The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam).

Accordingly, because the Michigan Court of Appeals did not address on the merits the due process claims relating to Harp's testimony, this Court's review of that issue is *de novo*.  Moreover, if this Court were to find constitutional error, it would not be compelled by the AEDPA to defer to the state court's determination that admission of the testimony was harmless.  Instead, the Court would conduct a *de novo* inquiry of harmlessness.

### A.   Detective Harp offered opinion testimony even though he was not an expert and his opinion was not rationally based on his own perception

Essentially, Petitioner argues that Harp's testimony violated due process because it did not comply with the requirements set forth in Michigan Rules of Evidence 701 or 702 for lay or expert opinion testimony.  Certainly, there are federal decisions requiring that opinion testimony must meet the requirements Federal

Rules of Evidence 701 and 702,[4] but those decisions are based on the rules themselves, not the requirements of due process.  Indeed, the only case Petitioner cites that even suggests that unfounded expert testimony violates due process is *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007).  (Pet'r's Br., ECF No. 2, PageID.46.)

An understanding of the *Ege* holding requires an examination of the facts underlying the state's prosecution of Carol Ege for the killing of Cindy Thompson:

> Ege and Thompson had both been romantically involved with Mark Davis, whose child Thompson allegedly was carrying.  Davis testified that he found Thompson in her upstairs bedroom some time before 5:00 a.m. on February 22, 1984, bludgeoned and stabbed to death, her organs laying beside her.  There was no sign of forced entry at Thompson's home, and the back door was found unlocked.  The phone cords had been cut.  Thompson was last seen alive on the evening of February 21, sometime between 8:45 and 9:15 p.m.  The initial police investigation, concluded in April 1984, yielded no definitive evidence.  Eight years later, however, the investigation was reopened as a result of persons coming forward with evidence allegedly incriminating Ege.  During the course of this reopened investigation, in 1992–1993, evidence that had been collected at the murder scene in February 1984 was submitted to the Michigan state crime lab for the first time.  None of the evidence submitted to the crime lab connected Ege to the crime.  The lab results yielded fingerprints of Davis and Thompson and hairs of Thompson and others, but no similar trace evidence connected to Ege.  Thompson's body was exhumed in 1993, apparently to investigate a mark on her left cheek visible in photographs taken at the murder scene.  The initial autopsy report had concluded that the mark was livor mortis.  Ege was tried for murder following the 1992–1993 investigation.
>
> At trial, the prosecution attempted to show that Ege was obsessed with Davis and was therefore furiously jealous of Thompson and the child Thompson was carrying.  The prosecution presented witnesses who testified that Ege and Thompson had argued several years prior to Thompson's death, when Ege entered Thompson's house to destroy a

---

[4] Federal Rule of Evidence 701 also requires that lay opinion testimony be "rationally based on the witness's perception."  Fed. R. Evid. 701.  And Federal Rule of Evidence 702 also permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion . . . ."  Fed. R. Evid. 702.

watch case and T-shirts that Thompson had bought for Davis.  Further evidence was presented that Ege and Thompson engaged in a physical struggle at Thompson's sister's house, when Thompson was five months pregnant.  Witnesses also testified that Ege had attempted to hire two different men to kill Thompson, and that about one week before Thompson's death, Ege had asked her roommate, Carol Parker, to provide her with an alibi in exchange for free rent.  Finally, several witnesses testified that Ege had expressed to them a desire to see Thompson killed.  One witness testified that after Thompson became pregnant, Ege said to her, "Cindy [Thompson] was not going to have the baby; that she didn't know how or why, and she didn't want to get me involved, but that she wasn't going to have the baby."  Another witness testified that Ege told her "she could stomp the baby out of her, slit her throat, rip her up in little pieces and think nothing of it."  Yet another witness testified that Ege told him she wanted Thompson "really hurt bad, either beat her up bad or kill her."

Ege denied virtually all of the allegations made by prosecution witnesses, and much of their testimony was called into serious question on cross-examination, either through impeachment or showing of bias. The defense's theory of the case was that Ege could not have been at the crime scene on the evening of the murder because she was at home all evening, and that although there was perhaps some evidence pointing to her, a more compelling circumstantial case could in fact be made against several of the prosecution's witnesses, including Davis.  Davis admitted that he had been drinking most of the day and night prior to Thompson's murder, and that by the time he decided to go to Thompson's house on the morning of February 22, he had consumed approximately five bottles of wine.  Davis's presence at Thompson's house coincided approximately with the time she died.  His alibi that he was drinking at a friend's house up until the time that he found Thompson's body was largely undermined by the friend's subsequent testimony that he and Davis were not in fact together that night.  Also on cross-examination, Davis testified that he never believed that Ege had killed Thompson, and affirmed that Ege had in fact been home all night.

The prosecution's expert witness, Dr. Alan Warnick, opined that the mark found on Thompson's cheek, which the original autopsy report had concluded was liver mortis, was actually a bite mark.  Dr. Warnick was unable to examine the actual injury, because Thompson's body was too badly decomposed upon exhumation nine years after the murder. Thus, Dr. Warnick relied on photographs of the mark which had been taken at the time of the initial autopsy, in 1984.  Dr. Warnick compared dentitions of several suspects raised by the defense and found that none of them could have made the bite mark.  He also checked Ege's dentition

and concluded that it was highly consistent with the bite mark.  Dr. Warnick was asked by the prosecution, "Let's say you have the Detroit Metropolitan Area, three, three and a half million people.  Would anybody else within that kind of number match like she did?"  He responded, "No, in my expert opinion, nobody else would match up." Ege's defense counsel did not object to Dr. Warnick's testimony, but rather called two expert witnesses in rebuttal.  The first, a pathology professor at Wayne State University, concluded that the mark on Thompson's cheek was liver mortis, and not a bite mark.  The second, a dentist and medical doctor, provided similar testimony, and added that even if it were a bite mark, the pattern did not align with Ege's dentition.

A jury found Ege guilty of first-degree murder.

*Ege*, 485 F.3d at 367–68 (footnote omitted).  The *Ege* court noted that "[t]he prosecution failed to lay any foundation whatsoever, either for Dr. Warnick's connection of the bite mark to Ege's dentition in general, or for Warnick's assertion that the two were connected by a probability of 3.5 million to one."  *Id*. at 374–75.  It was also noteworthy that, by the time the Sixth Circuit considered the case, Dr. Warnick had been so discredited in the eyes of the Wayne County Prosecuting Attorney's Office that the office would no longer approve warrants where the main evidence as to the identity of a potential defendant was a Dr. Warnick opinion that the potential defendant was the source of bite marks.  *Id*. at 370.

The *Ege* court applied the same basic standard cited above regarding whether the improper admission of evidence violated due process:  "due process is violated, and thus habeas relief warranted, only if an evidentiary ruling is 'so egregious that it results in a denial of fundamental fairness.' "  *Id*. at 375 (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)).  And " [w]hether the admission of prejudicial evidence constitutes a denial of fundamental fairness turns upon whether the

evidence is material in the sense of a crucial, critical highly significant factor.' " *Id.*

(quoting *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000)).

Petitioner attempts to imbue Detective Harp's testimony with the same

significance to his case that Dr. Warnick's had to Ege's case:

> Without Det. Harp's testimony regarding delayed disclosure, being admitted in violation of Mr. Howell's constitutional rights, the prosecution had no evidence to explain [the victim's] unusual change in her story, first in February 2013 while being interviewed by Det. Swanson she stated nothing happened between her and Mr. Howell. (T 3, 131). Det. Swanson also testified about his interview of [the victim] and said she told him nothing inappropriate has 'ever' happened between them. (T 3, 192). Second in June 2013 several months later during a conversation with police while she was in a juvenile facility in Vasser, Michigan, [the victim] changed her story and alleged she did have sex with Mr. Howell. (T 3, 133). Det. Harp's testimony which explained that she only failed to disclose this information sooner, because of trauma associated with being sexually assaulted also helped explain away testimony that would otherwise by highly suspect. The testimony also compelled the conclusion that [the victim] must have been sexually assaulted by Mr. Howell because her case was a case of delayed disclosure.
>
> Mr. Howell's constitutional right to due process and a fair trial w[]ere egregiously violated. These violations were compounded further by the fact that the science behind delayed disclosure is wrong. Indeed, as Dr. Okla set forth in her affidavit, current studies do not support so-called delayed disclosure; in fact, delayed disclosure is often an earmark for a 'false allegation.'"

(Pet'r's Br., ECF No. 2, PageID.45.)  Recall, that Detective Harp said this:

> We've had training that touched on victims involved in sexual assaults. And the sensitivity of the acts themselves.  It's hard for them to come out with that.  The late reporting is common and I've experienced that with prior complaints.
>
> [and]
>
> Yes [this is a case of delayed disclosure.]
>
> [and]

Yes [that's consistent with what I have seen before.]

(Trial Tr. IV, ECF No. 7-10, PageID.916–917.)  Detective Harp's testimony is hardly the fulcrum on which the prosecutor's case against Petitioner turned.[5]  Nor was the nature of Harp's testimony outside the realm of commonly admitted testimony.

In Petitioner's post-judgment motions for relief in the trial court, Petitioner offered the affidavit of Dr. Okla who opined that "delayed disclosure" was a discredited theory and that a delay in disclosure might actually evidence fabrication. The conflict between Dr. Okla's affidavit averments—that delayed disclosure of sexual abuse may evidence fabrication—and Detective Harp's testimony—that delayed disclosure of sexual abuse is common and follows from the difficulty inherent in disclosing sensitive sexual acts—plays out frequently in criminal sexual conduct trials.  By way of example, just a couple of weeks ago, the Michigan Court of Appeals rejected a challenge that a witness did not have the necessary expertise to offer an opinion regarding delayed disclosure; the court affirmed the admission of testimony from an examining physician that a child's late disclosure of sexual abuse could be considered to be consistent with other victims of sexual abuse.  *People v. Walden*, No. 350422, 2021 WL 661855, at *6 (Mich. Ct. App. Feb. 18, 2021).  Similarly, the week before that, the Michigan Court of Appeals affirmed the admission of such testimony

---

[5] Petitioner contends that "[w]ithout Det. Harp's testimony regarding delayed disclosure[] being admitted in violation of Mr. Howell's constitutional rights, the prosecution had no evidence to explain [the victim's] unusual change in her story." (Pet'r's Br., ECF No. 2, PageID.45.)  Petitioner ignores the victim's testimony that she did not disclose the incident when first asked about it by Detective Swanson because she was disgusted with herself.  (Trial Tr. III, ECF No. 7-9, PageID.768–769.)

from a forensic interviewer.  *People v. Stickney*, No. 350304, 2021 WL 520086 (Mich. Ct. App. Feb. 11, 2021).  The *Stickney* court explained:

> [D]efendant has not directed this Court to any Michigan case to support his claim that the trial court should have rejected expert testimony regarding the concept of delayed reporting.  Indeed, our Supreme Court has repeatedly recognized the propriety of expert testimony to explain the phenomenon of "delayed reporting" in sexual assault cases involving young victims.  See, e.g., *Kowalski*, 492 Mich at 123-124, 821 NW2d 14, *People v. Peterson*, 450 Mich 349, 352-353, 537 NW2d 857 (1995), and *People v. Beckley*, 434 Mich 691, 716-717, 456 NW2d 391 (1990).  In *Peterson*, the Court held that "where there are common misperceptions regarding the behavior of the victim on which a jury may draw an incorrect inference, such as . . . delayed reporting, the prosecutor may present limited expert testimony dealing solely with the misperception."  *Peterson*, 450 Mich at 379, 537 NW2d 857.  [T]he purpose of allowing expert testimony in these kinds of cases is to give the jury a framework of possible alternatives for the behaviors," and "to provide sufficient background information about each individual behavior at issue which will help the jury to dispel any popular misconception commonly associated with the demonstrated reaction." *Beckley*, 434 Mich at 726, 456 NW2d 391.

*Stickney*, 2021 WL 520086, at *5.  Moreover, the Michigan Court of Appeals affirmed the admission of testimony regarding delayed disclosure from a detective in *People v. Dobek*, 732 N.W.2d 546, 561–563 (Mich. Ct. App. 2007).  Of course, there are also many cases in the Michigan appellate courts where the admission (or exclusion) of Dr. Okla's testimony regarding delayed disclosure is affirmed.  The point is not that there are two sides to the issue, the point is that neither side of the issue is likely to be beyond the understanding of most jurors.[6]

---

[6] Perhaps we are already at a point where jurors are not likely to credit or discredit allegations of sexual abuse because they are made immediately after, or months after, or years after sexual abuse allegedly occurred.  Perhaps the reasons a particular individual might report sexual abuse immediately after it occurs while another might wait months or years can be categorized as common sense in the present zeitgeist.  Consider, for example, the influence of the #MeToo movement:

Nor is the testimony of Detective Harp of a similar character to that provided by Dr. Warnick—that science shows that there is a 1 in 3.5 million chance that someone other than the defendant committed this crime.    Notwithstanding Petitioner's hyperbolic description of the significance of Detective Harp's testimony,[7] Petitioner has failed to show that Harp's testimony was "a crucial, critical highly significant factor."  *Ege*, 485 F.3d at 375 (internal quotes omitted).  That conclusion is echoed in the court of appeals' determination that any error in the admission of the testimony was harmless.  Therefore, the undersigned concludes that Petitioner has

---

A brief overview of the #MeToo movement is helpful place to start. "Me Too" was first coined in 2006 by Tarana Burke, a Black female activist, as the name for a movement to help victims of sexual harassment and assault.  #MeToo catapulted into the public's consciousness in October 2017.  On October 5, 2017, Jodi Kantor and Megan Twohey at the New York Times published an article detailing decades of sexual harassment allegations against the Hollywood producer Harvey Weinstein.  (See Def.'s Mem. 4 n.3 (citing Jodi Kantor and Megan Twohey, Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades, N.Y. Times (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html).)  Five days later, an article in the New Yorker detailed additional allegations against Weinstein.  On October 15, 2017, actor Alyssa Milano wrote on Twitter, "if you've been sexually harassed or assaulted write 'me too' as a reply to this tweet."  Within days, thousands heeded her call.  And thus, the voices of few became many, and the #MeToo movement became a chorus bolstering the credibility of victims of sexual assault and harassment.

*Elliot v. Donegan*, 469 F. Supp. 3d 40, 51–52 (E.D.N.Y. 2020).  If sexual abuse and harassment so pervades our society, and social media movements are required to overcome the reluctance to report the pervasive problem, competing expert testimony on delayed disclosure would seem less consequential than the jurors' own experience with these issues.

[7] Petitioner's claim that "[Harp's] testimony also compelled the conclusion that [the victim] must have been sexually assaulted by Mr. Howell because her case was a case of delayed disclosure[,]" (Pet'r's Br., ECF No. 2, PageID.45), borders on the absurd.

failed to demonstrate that the admission of Harp's testimony violated due process because the testimony did not comply with the requirements of Michigan Rules of Evidence 701 or 702.

### B.    Detective Harp testified about the complainant's credibility, an issue reserved for the jury

Petitioner's argument contends that Harp's testimony may have been objectionable because it embraced an ultimate issue reserved for the jury.  (Pet'r's Br., ECF No. 2, PageID.44) ("More importantly, however, Det. Harp's testimony is improper under both MRE 701 and 702 because his opinion invaded the province of the jury by vouching for the credibility of a complaining witness.").  Even if Detective Harp's testimony might be deemed an invasion of the province of the jury, Petitioner has not cited any cases declaring that the introduction of such testimony rises to the level of a due process violation.[8]

Interpreting the Federal Rules of Evidence, the Supreme Court in *United States v. Johnson*, 319 U.S. 503 (1943), considered the admissibility of expert testimony that was challenged because it "invaded the jury's province."  *Id*. at 519.

---

[8] In his habeas brief, Petitioner cites no authority to support the proposition that testimony invading the province of the jury is inadmissible.  In his state appellate briefs, Petitioner cited state authority in support of that proposition.  (Pet'r's Appeal Br., ECF No. 7-20, PageID.1471.)  The authority cited, however, relied on a state rule of law, not the due process clause.  Indeed, only one of the cited cases even mentions due process, *People v. Buckey*, 378 N.W.2d 432 (Mich. 1985), and in that case, due process is only mentioned in the solo partial concurring opinion of Justice Levin.  Due process did not form the basis for that portion of the majority opinion on which Petitioner relies.

The court was not troubled by the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury.  The correctness or credibility of no materials underlying the expert's answers was even remotely foreclosed by the expert's testimony or withdrawn from proper independent determination by the jury.  The judge's charge was so clear and correct that no objection was made, though, of course, there were exceptions to the refusal to grant the usual requests for charges that were either redundant or unduly particularized items of testimony. The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence.  The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case.  So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's, we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules.

*Johnson*, 319 U.S. at 519-20.  Federal Rule of Evidence 704 (a) expressly states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *Id.*  The parallel Michigan Rule of Evidence is virtually identical.  Mich. R. Evid. 704.  Federal Rule of Evidence 704 was passed for the express purpose of abolishing case law that held witnesses could not express opinions on ultimate issues.  Advisory Committee Notes, Fed. R. Evid. 704.  In *United States v. Scheffer*, 523 U.S. 303 (1998), in a concurring opinion, Justice Kennedy quoted the Advisory Committee Notes to explain the change:

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions.  The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information.  7 Wigmore §§ 1920, 1921; McCormick § 12.  The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric."  7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

Therefore, Petitioner has failed to show that Detective Harp's testimony violated due process, even if it embraced an ultimate issue reserved for the jury.  Accordingly, he is not entitled to habeas relief on that due process claim.[9]

### C.  Ineffective assistance of counsel for failing to challenge Harp's testimony

Petitioner contends that counsel should have objected to Harp's testimony regarding delayed disclosure.  The court of appeals analyzed that contention under the following standard:

> In regard to defendant's ineffective assistance of counsel claim, "[t]o prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's errors."  *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003), citing *People v Kevorkian*, 248 Mich App 373, 411; 639 NW2d 291 (2001).

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1328.)

---

[9] Because the undersigned concludes that Petitioner has not shown error, it is unnecessary to address whether or not any error was harmless under *Brecht*.

Under clearly established federal law, to show ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  A court considering a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a court determines that counsel's performance, in light of the circumstances as they existed at the time of counsel's action, was outside the wide range of reasonable professional assistance, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 690–91.

Although the court of appeals cited state law as the source of the standard,  the state standard is functionally identical to the standard applied under clearly established federal law.  Accordingly, the only question that remains is whether the court of appeals applied the standard reasonably.

The court of appeals chose to address the standard on the second prong, presuming that trial counsel was ineffective for failing to object, and then examining whether that ineffectiveness caused prejudice.  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1329.)  That choice is also consistent with clearly established federal law.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The court of appeals, having already concluded that any error in the admission of Harp's testimony did not affect Petitioner's substantial rights, not surprisingly concluded that Petitioner had failed to demonstrate prejudice from counsel's failure to object.  The court reasoned:

> In this matter, claimant gave a credible reason for her delay in reporting.  In addition, multiple young girls testified about defendant's sexual remarks, advances, sexual behavior towards claimant, and his grooming with marijuana and alcohol.  The trial court noted when twice denying defendant's motion for a new trial that the case came down to whose testimony was believed by the jury.  Claimant testified that she and defendant engaged in sex.  Defendant denied engaging in any sex act with defendant and also denied the allegations set forth by other witnesses.  A reasonable jury could choose to believe defendant and the other witnesses, which, as the trial court noted, is precisely what happened.  Review of the record in its entirety leads us to find it doubtful that Harp's brief reference to the notion of "delayed disclosure" would have resulted in a different outcome at trial.  Accordingly, defendant cannot demonstrate [that] he was prejudiced by trial counsel's failure to object and defendant is not entitled to relief on this issue.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1329.)

Petitioner attacks this analysis as unreasonable.  That attack, however, depends on the conclusion that Harp's testimony amounted to "delayed disclosure=true disclosure" while, according to Petitioner, "delayed disclosure=fabricated disclosure."  Petitioner's characterization of Harp's testimony is a gross exaggeration that finds no support in the record, Petitioner's characterization of Dr. Okla's anticipated testimony is a gross exaggeration that finds no support in the record, and Petitioner's suggestion that "delayed disclosure" was a critical consideration in his trial likewise finds no support in the record.

26

For the reasons set forth above, Detective Harp's limited testimony touching upon delayed disclosure based on his training and experience were innocuous in the context of Petitioner's trial. Accordingly, the undersigned concludes that Petitioner has failed to show that the court of appeals' determination that counsel was not constitutionally ineffective was contrary to, or an unreasonable application of, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this claim.

## IV. *Brady* violation

Petitioner next complains that the prosecutor suppressed favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner identifies two specific categories of evidence that he claims the prosecution suppressed. First, he claims the prosecution suppressed the evidence that the victim's friend, identified by the court of appeals as ML, would have provided. ML was listed as a witness by the prosecution, had been interviewed by police investigators, and was under subpoena to appear at trial. But the prosecution did not call her to testify at trial. Petitioner identifies exculpatory information that ML possessed: first, ML stated that the incident could not have happened as the victim described because if the victim had been awoken by Petitioner and coaxed into the bedroom, ML would have woken up as well; and second, ML reported that the victim told ML that the victim had not been "raped." (Pet'r's Br., ECF No. 2, PageID.53–54.) The specific non-disclosure event of which Petitioner complains was highlighted during trial. After the prosecutor indicated he would not call ML to testify, Petitioner's counsel asked "whether [ML] possessed exculpatory information[.]" (*Id.*, PageID.52.) The prosecutor responded

that "he had not interviewed her." (*Id.*)  Petitioner contends that response suppressed the fact that the Chippewa County Sheriff's Office had interviewed ML.[10]

Second, Petitioner claims the prosecution suppressed the victim's "extensive juvenile record" and the Chippewa County Prosecutor's "direct involvement in on-going proceedings against the victim." (*Id.* at 55.)  Petitioner contends that such evidence would have impeached the victim's testimony as it would have provided "potential ulterior motives" for the victim to cooperate with the prosecution, be biased, and lie. (*Id.*)

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  The Supreme Court has held that "[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

---

[10] There were apparently two interviews of ML, one on February 21, 2013, and one "sometime in the winter of 2014" by Deputy Postma of the Chippewa County Sheriff's Office.  (Mot. Hr'g Tr., ECF No. 7-19, PageID.1299.)  The former interview was disclosed; the latter interview was not.  The latter interview was apparently memorialized in a police report that included the following statements: "I asked her if she had observed Howell make inappropriate contact with [the victim], she said she had not seen anything between [the victim] and Howell.  Then she wanted to talk about an incident with Brianna Hart."  (Mot. Hr'g Tr., ECF No. 7-13, PageID.1153.)  That interview, however, was not conducted in connection with the investigation of Petitioner's case by the Sault Sainte Marie Police Department, it was conducted in connection with an investigation of ML and her mother for credit card fraud by the Chippewa County Sheriff's Department.  (Mot. Hr'g Tr., ECF No. 7-19, PageID.1304.)  A different prosecutor handled the credit card fraud cases.  (*Id.*)

ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009).  A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'"  *Bagley*, 473 U.S. at 682 (quoting *Strickland*, 466 U.S. at 694.).

However, the *Brady* rule "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial."  *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).  The government's failure to disclose potentially exculpatory evidence does not violate *Brady* "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) . . . , or where the evidence is available to defendant from another source."  *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991).  "[I]n such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's *Brady* claims:

> "A defendant has a due process right of access to certain information possessed by the prosecution." *People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998), citing *Brady*, 373 US at 83.  A *Brady* violation occurs if: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).  "The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the

prosecution's good or bad faith . . . Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. at 150 (citation and quotation marks omitted). "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (citation and quotation marks omitted).

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1329.) That standard, although drawn principally from state authority, is entirely consistent with clearly established federal law. Thus, the only question that remains for habeas review is whether the court of appeals applied that standard reasonably.

### A.    ML

It is a little difficult to pin down exactly what evidence the prosecution is accused of suppressing with regard to ML. There were statements ML provided by affidavit after the trial that indicated (1) the events could not have occurred as the victim described because ML would have woken up and (2) the victim told ML that that Petitioner had not raped her. Despite two new trial motion hearings and a *Ginther* hearing, Petitioner has not provided any evidence that ML made those particular statements before the trial or that the prosecutor was aware that ML had made those particular statements before the trial.

The ML statements that the prosecutor might be imputed as knowing about, that were made before trial, appear to have occurred during an interview with the Sault Sainte Marie Police Department during the investigation of Petitioner's crimes and statements made during an interview with the Chippewa County Sheriff's Department during an investigation of credit card fraud of which ML and her mother were accused. It appears to be undisputed that the prosecutor provided a police

report regarding the interview by Sault Sainte Marie police, but did not provide a
police report regarding the Sheriff's Department interview.

The only information regarding the content of the undisclosed report in the
record provided to this Court appears in the transcript of one of the new trial motion
hearings. Petitioner's counsel offered the following quote from that report: "I asked
her if she had observed Howell make inappropriate contact with [the victim], she said
she had not seen anything between [the victim] and Howell. Then she wanted to talk
about an incident with [another girl.]" (Mot. Hr'g Tr., ECF No. 7-13, PageID.1153.)
Petitioner's counsel apparently stretched those words into the following statement
during the new trial motion: "She clearly told the police that John Howell did not
have sex with [the victim.]" (Mot. Hr'g Tr., ECF No. 7-13, PageID.1132.) There
appears to be no record support for that representation.[11]

The Michigan Court of Appeals reached the same conclusion:

As to defendant's contention of a *Brady* violation we note that the record
does not support the first *Brady* requirement by showing that there was

---

[11] Indeed, even ML's affidavit did not go that far. ML's affidavit stated: "The other
time I spoke to [the victim] about the situation we were riding together on a transport
van in Vassar, Michigan to a court date. I asked [the victim] whether the charges
were true, whether Mr. Howell really raped her, and she said only "No." I did not ask
her anything else." (Pet'r's Appeal Br., ECF No. 7-20, PageID.1479) (internal quotes
omitted). ML's affidavit made other statements that were far more exculpatory, for
example, "ML averred that '[n]othing was going on in [defendant's bedroom', that
claimant was with ML in the living room 'sleeping right next to me', that '[t]here
[was] no possible way that anyone was having sex in either of the bedroom; I would
have heard it', and that '[t]here [was] no possible way that [claimant] got up from
where she was sleeping right next to me and went anywhere in the house because
her movement would have awakened me.'" (Mich. Ct. App. Op., ECF No. 7-20,
PageID.1330.) But there is no suggestion that the prosecutor had any knowledge,
direct or imputed, that ML would offer that testimony.

suppression.  Defendant's assertion that the prosecution withheld ML's exculpatory information from defense counsel is unsupported.  There was no showing that the prosecutor or the police were aware that ML would testify that claimant was not present on a night she would identify as the one where the alleged assault would have occurred or that claimant had denied that a rape took place.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1330.)  That determination appears to be reasonable and well-grounded in the record.  Thus, Petitioner has failed to show that the court of appeals' determination that the prosecutor did not suppress exculpatory information based on a failure to disclose the Sheriff's Department police report is contrary to, or an unreasonable application of, clearly established federal law.

Petitioner also suggests that the prosecutor suppressed ML's exculpatory information by interfering with Petitioner's access to ML.  The interference took the form of the prosecutor's witness coordinator informing ML that she was not required to speak with defense counsel.  That does not appear to have had any significant impact on ML though:

ML further averred that defendant's attorneys wanted to talk to her but that her father and step-mother would not allow it.  She noted that she was subpoenaed and was in the hallway when defendant's attorney asked to talk to her and her step-mother told him no.  ML averred, "The attorney and my mother went into a room to talk and I thought it over and then just got up and went into the room with them."  ML averred, "I only had a few minutes to talk to the attorney before he had to go back into the court room for something.  I told him some things, but I did not have time to tell him everything or to explain all about why I knew the charges were not true."

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1330.)

The Michigan Court of Appeals concluded that the prosecutor had not suppressed ML as a witness:

> Moreover, ML herself was not suppressed.  She was identified on the prosecutor's witness list, and defense counsel was provided contact information for ML's mother and made successful contact with her. Moreover, counsel was able to have a "brief exchange" with ML during which they discussed "several aspects of the case."  It was a tactical decision by trial counsel not to call ML to testify.  In a case where trial counsel was provided the name of the witness, a contact number for the witness and spoke directly to the witness, we fail to glean even an argument for a *Brady* violation.

(*Id.*)  This determination also is well-grounded in the record and entirely consistent with clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on the ground that the prosecutor suppressed evidence ML could have provided or suppressed ML as a witness.

### B.   The victim's juvenile record

Petitioner's argument regarding the prosecutor's obligation to provide the victim's juvenile record is built on the foundation of *Davis v. Alaska*, 415 U.S. 308 (1974).  In *Davis*, the Supreme Court considered whether state laws and rules intended to preserve the anonymity of juvenile offenders and prevent exposure of a juvenile's record of delinquency must yield to the Sixth Amendment right of confrontation.  Davis's defense counsel wanted to explore with key witness Green the fact that he was on probation for a juvenile offense.  The *Davis* Court explained:

> [C]ousel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary.  From this petitioner would seek to show—or at least argue—that Green acted out of fear or concern of possible jeopardy to his probation.  Not only might Green have made a hasty and faulty

identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but Green might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation.  Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question.

*Davis*, 415 U.S. at 311.  The Court concluded that "the right of confrontation [was] paramount to the State's policy of protecting a juvenile offender" and "whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record . . . [was] outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness."  *Davis*, 415 U.S. at 319.

Petitioner cites *Davis* for the proposition that a juvenile record calls into question the credibility of the juvenile, and then he cites *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016), for the proposition that the *Brady* rule applies to evidence undermining witness credibility.  Combining the two, Petitioner suggests that the *Brady* rule requires prosecutors to produce juvenile records of key prosecution witnesses.  That suggestion, however, is contrary to clearly established federal law.

In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), a criminal defendant made the same argument that Petitioner makes here:  that the *Davis* holding that elevates the right of confrontation over the right to preserve as confidential records regarding minors necessarily requires that prosecutors make available such records.  The Supreme Court rejected that argument:  "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all

34

information that might be useful in contradicting unfavorable testimony." *Ritchie*, 480 U.S. at 53 (footnote omitted).

The Michigan Court of Appeals rejected Petitioner's claim because it did not consider the evidence that was "suppressed" to be material:

> Defendant next argues that the prosecution failed to turn over impeaching evidence related to claimant's juvenile record. The record includes some documentation of delinquency proceedings involving claimant that indicated 2011 probation violations and truancy from school in 2010, 2011, 2012, and 2013, and that claimant was placed in "the Sault Tribe Youth Facility" in 2011, had completed a "Juvenile Justice Diversion & Reintegration Alternatives" program in 2012, and was placed in the "Vassar Home Passages Program" in 2013. Defendant asserts that without this information, defense counsel was denied the opportunity to explore potential ulterior motives for claimant to be cooperative with the prosecution, and to rebut the prosecution's theory that claimant had no motivation to lie.

> Relative to the issue of claimant's alleged past criminal behavior, the fact that claimant may have had charges that had been adjudicated or were pending would not have been admissible at trial under MRE 609(e) which states:

>> Juvenile adjudications. Evidence of juvenile adjudications is generally not admissible under this rule, except in subsequent cases against the same child in the juvenile division of a probate court. The court may, however, in a criminal case or a juvenile proceeding against the child allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission is necessary for a fair determination of the case or proceeding.

> One of the initial requirements for demonstrating a *Brady* violation is that the proffered evidence was admissible at trial; otherwise it would not constitute evidence. Such was the decision in *Wood v. Bartholomew*, 516 US 1, 6, 13; 116 S Ct 7; 133 L Ed2d 1 (1995) wherein the Supreme Court held that failure to produce polygraph results that were inadmissible under state law could not form the basis of a *Brady* violation because they were inadmissible and as such did not constitute evidence. Here, MRE 609(e) made claimant's prior criminal past inadmissible. While defendant argues that claimant's record is

35

evidence that she had incentive to help the prosecution in hopes of getting help with her juvenile proceedings, this alone is insufficient to establish a *Brady* violation because materiality requires a showing that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. See, *Kyles v. Whitley*, 514 US 419, 433–434; 131 L Ed2d 490; 115 S Ct 1555 (1995); *United States v. Bagley*, 473 US 667, 682; 87 L Ed2d 481; 105 S Ct. 3375 (1985) holding that the failure to disclose evidence justifies setting aside a conviction, only where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different.  See also, *Chenault*, 495 Mich at 150. Defendant cannot demonstrate that the result of the proceeding would have been different by forcing the State to produce inadmissible documents.  *Kyles*, 514 US at 433–434.  Accordingly, defendant is not entitled to relief on this issue.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1331.)

The court of appeals' determination that evidence of the victim's juvenile adjudications would not be admissible under state law is binding on this Court.  The court's further conclusion that the inadmissible "suppressed" evidence was not material under *Brady* is not binding, but the Court must defer to it if it is reasonable.

It is important to recognize that the court of appeals did not conclude the evidence was immaterial because it was inadmissible.  *Brady* does not measure materiality based on potential difference in the outcome if the suppressed evidence were disclosed to the jury; it measures materiality based on potential difference in the outcome if the suppressed evidence were disclosed to the defense.  *Bagley*, 473 U.S. at 682 ("The evidence is material if there is a reasonable probability that, had the evidence been disclosed ***to the defense***, the result of the proceeding would have been different.") (emphasis added).  Thus, the fact that evidence of juvenile adjudications would not be disclosed to the jury because it is inadmissible does not end the *Brady* inquiry.  The Michigan Court of Appeals acknowledged that

distinction.  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1331) ("materiality requires a showing that there is a reasonable probability that, had the evidence been disclosed **_to the defense_**, the result of the proceeding would have been different.") (emphasis supplied).

The key to the materiality of the "suppressed" evidence here, based on *Davis*, is not the nature of the juvenile offenses;[12] it is the fact of them.  It is the possibility that the victim may have been beholden to the prosecutor in some way that creates the possibility of bias.  But, even without the inadmissible content of the victim's juvenile record, the defense was aware of the fact of juvenile offenses.  The victim, and ML for that matter, appeared at the preliminary examination in "uniforms" that indicated their placement in the Vassar House Passages program.[13]  The preliminary examination judge commented on their attire and confirmed that the victim was in

---

[12] The court of appeals described the general nature of the offenses and they do not appear to be the sort of offenses that "'would be admissible to attack the credibility of an adult[.]'"  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1331) (quoting Mich. R. Evid. 609(e)).  Moreover, the victim testified to drug and alcohol use that was more serious than the offenses referenced by the court of appeals.

[13] According to Petitioner's second motion for new trial (Mot. Hr'g Tr., ECF No. 7-13, PageID.1126–1128), during January of 2013, the victim was detained in Chippewa County on a truancy petition.  During February of 2013, she participated in her first interview with Sault Ste. Marie Police Department Detective Swanson.  A month later, she was continued in detention at the Vassar House.  She was interviewed there three months later by a prosecutor and Detective Harp.  On September 17, she testified at the preliminary examination.  On February 27, 2014, she testified at trial.  On July 15, 2014, she was released from the jurisdiction of the juvenile court.  Petitioner acknowledged that he was able to piece together this information, apparently from the police reports disclosed by the prosecutor and from the probate court estate file that followed the victim's father's death.  The preliminary examination reveals that the father died some time before the preliminary examination.

placement.   (Prelim. Exam. Tr., ECF No. 7-1, PageID.196.)   Petitioner's counsel specifically asked the victim why she was in placement and for how long.[14]   (*Id.*, PageID.219-220.)

As noted above, the *Brady* rule "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial." *Apanovitch*, 466 F.3d at 474.  The defense was aware—or certainly should have been aware—of the fact of the victim's juvenile placement and, consequently, aware of at least one juvenile offense that implicated a relationship with the prosecutor at the time of trial.  Under those circumstances, adding additional inadmissible detail by turning over the actual juvenile adjudication files would not create a reasonable probability of a different result.  Therefore, Petitioner has failed to demonstrate that the appellate court's determination that the juvenile files were not material under *Brady* is contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas relief on this claim.

### C.    Counsel was ineffective for not sufficiently investigating ML and the victim

Petitioner contends that, if the failure to exploit ML's exculpatory testimony and the victim's juvenile record were not the prosecutor's fault for suppressing evidence in violation of *Brady*, then the failure must be his counsel's fault for not

---

[14] Despite the information available in the preliminary examination transcript, at the *Ginther* hearing Petitioner's counsel—substitute counsel for the attorney who represented Petitioner at the preliminary examination—did not specifically ask for juvenile records.  (*Ginther* Hr'g Tr., ECF No. 7-14, PageID.1175–1176.)

adequately investigating those witnesses.  The court of appeals rejected Petitioner's alternative ineffective assistance claims:

> "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010).  "As our Supreme Court has recognized, the materiality prong of the *Brady* test requires the same showing of prejudice required to establish ineffective assistance of counsel."  *People v Stokes*, 312 Mich App 181, 192; 877 NW2d752 (2015).  Because defendant cannot demonstrate that any material evidence was withheld, he cannot demonstrate that any failure by his attorney to seek this evidence earlier warrants relief.  *Id.*

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1331-32.)

The court of appeals' choice to forego the first prong of the *Strickland* analysis and rely instead on the second prong is consistent with clearly established federal law.  *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  Moreover, the court of appeals' conclusion that the showing required for *Brady* materiality is the same as the showing required for *Strickland* prejudice is also consistent with clearly established federal law.  *Id.* at 694 ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs*, 427 U.S. at 104 . . . [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors [as opposed to but for the prosecution's failure to disclose the evidence to the defense], the result of the proceeding would have been different.").[15]  Therefore, for the same reasons this Court

---

[15]*See also O'Neal v. Burt*, 582 F. App'x 566, 576 (6th Cir. 2014) (court cited *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), as "equating the prejudice inquiry under

must defer to the state appellate court's *Brady* materiality analysis, it must defer to the state appellate court's *Strickland* prejudice analysis as well.

## V. Prosecutorial misconduct

Finally, Petitioner claims that his right to due process was violated by prosecutorial misconduct during closing arguments.  Petitioner highlights three distinct objectionable aspects of the prosecutor's closing:  first, Petitioner contends that the prosecutor's argument appealed to the jurors' sympathy and invited them to decide the case against Petitioner based on a civic duty extending beyond the facts of the case before them; second, Petitioner argues that the prosecutor improperly vouched for the victim's credibility; and third, Petitioner claims the prosecutor shifted the burden of proof.

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis

---

*Strickland* with the materiality inquiry under *Brady*."); *Jones v. Bagley*, 696 F.3d 475, 488 n.7 (6th Cir. 2012) ("[S]ince Jones was not prejudiced by any of his asserted *Brady* violations, he would not have been able to establish ineffective assistance of counsel [for not discovering the *Brady* material] under *Strickland*."); *United States v. Holder*, 657 F.3d 322, 332 (6th Cir. 2011) ("[T]he [ineffective assistance prejudice] standard is the functional equivalent to the standard for reviewing Holder's claim under *Brady*.") (footnote omitted).

in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12–13; *Darden*, 477 U.S. at 181–82; *Donnelly*, 416 U.S. at 646–47; *Berger v. United States*, 295 U.S. 78, 84–85 (1935). "[A] prosecutor's comments violate the defendant's right to due process only if, ***in context***, they 'undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice.'" *Winowiecki v. Gidley*, No. 20-1461, 2020 WL 6743472, at *2 (6th Cir. Sept. 8, 2020) (quoting *Young*, 470 U.S. at 16) (emphasis added); *see also United States v. McQuarrie*, 817 F. App'x 63, 81 (6th Cir. 2020) ("[C]ontext is key . . . .").

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d

501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).  Thus, in order to obtain

habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that

the state court's rejection of his prosecutorial misconduct claim " 'was so lacking in

justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement.' "  *Parker v. Matthews*, 567

U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

### A.    Civic duty

The Michigan Court of Appeals recounted the prosecutor's closing argument as

follows:

> In closing argument, the prosecutor stated that defendant was a predator whose crimes were premeditated and that he took advantage of claimant and tried to take advantage of other girls.  The prosecutor told the jury that it was their job to determine the credibility of witnesses and then provided the jury with "some things I want you to consider."  The prosecutor stated that claimant's story was "completely different" from defendant's and asked the jury to use its common sense to determine who was lying.  The prosecutor presented the elements of the crimes and explained that it was required to prove the charges beyond a reasonable doubt. To conclude his argument, the prosecutor stated:
>
>> Finally, there are really few citizens in our society that have fewer rights than children.  And we have a constitution that requires justice for all even though children are not yet adults and they don't have adult rights.  They still are entitled to justice.  If really justice is not for everyone it's for no one.  But they have a right to be believed.  They have a right not to be hurt.  And they have a right to, to be able to say what's happened to them and have people try to understand and try to hear what it is there [sic] saying.

And one of the things that [is] clear in this case, particularly with [claimant], is that she was trying to say what happened to her, how it made her feel.  And she was looking for you.  She was telling she was ashamed.  And though you can't make her not ashamed, you can make sure that she had a chance for justice in this, in this courtroom, in this room.

We tell kids its'[sic] okay for you to tell.  It took [claimant] a long time to do that but we say it's okay to tell.  You come to the adults when somebody, somebody does something wrong.  What parent hasn't said to their child, if somebody touches you in the wrong place, tell me.  Tell your mom.  Tell your dad, or grandma or grandpa.  We tell kids that all the time because we want them to tell so we can help them.  And we tell them when they do this we will help them.  We will believe them.

But it's only okay to tell if we admit to ourselves the terrible crimes that happen.  And children are used to satisfy the sexual desires of adults.  And it's okay to believe a child.  If we don't believe their nightmare, their nightmare just keeps on happening and then what happens to our justice.  We don't tell our children, don't come to us; don't tell us because we won't believe you because you're just children.

One of the reasons that vulnerable children, children with whose dads have died, their mothers are very sick with cancer.  Or mothers who can't, are by themselves, are victimized and sought out as good victims is because if these kids have some background, who's gonna believe them.  If this kid goes to placement, or this kids already in trouble, who's going to believe them.

And the predators count on that.  They've already in their mind discounted the value of those children because of who they are.  And they're counting that other adults would think in that same sick, wrong way.  That's not what we're doing.  Submitted to you that you have a chance to believe these children about the important parts of their testimony and that's what happened to them and what they saw.  You have a chance to say to them we will listen to you and we will hear what you're saying and we will hear what you're feeling and we will do what's right here.

43

> What's right here is to confirm that the Defendant . . . , a
> teacher in this community for over twenty years.  A man given,
> given respect in a position of responsibility and access to
> children.   A man who comes here and denies that he did
> anything wrong is really something different.  And what he is,
> is a child sexual predator.   Please find him guilty of all the
> charges, thank you.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1333.)

Petitioner's claim that the prosecutor's closing presents a "civic duty" argument begs the question:  what is a "civic duty" argument?  There is no clearly established federal law on that point.  The Supreme Court has frequently referenced jury service as a "civic duty," *see, e.g., Dietz v. Bouldin*, 136 S.Ct. 1885, 1896 (2016) ("Juries are of course an integral and special part of the American system of civil justice.  Our system cannot function without the dedication of citizens coming together to perform their civic duty and resolve disputes"); but the Court has never defined, or even commented on, "civic duty" arguments.

Although the Court has not mentioned "civic duty" arguments, it has commented on the dangers of prosecutorial argument that is "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice."  *Viereck v. United States*, 318 U.S. 236, 247 (1943).  The prosecutor's challenged argument in *Viereck* was as follows:

> In closing, let me remind you, ladies and gentlemen, that this is
> war.  This is war, harsh, cruel, murderous war.  There are those who,
> right at this very moment, are plotting your death and my death;
> plotting our death and the death of our families because we have
> committed no other crime than that we do not agree with their ideas of
> persecution and concentration camps.

This is war.  It is a fight to the death.  The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection.  We are at war.  You have a duty to perform here.

As a representative of your Government I am calling upon every one of you to do your duty.

*Id*. n. 3.  The *Viereck* Court went on to heartily condemn that argument:

At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury where highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted.  We think that the trial judge should have stopped counsel's discourse without waiting for an objection.  "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 [(1935)].

*Id*. at 248.  Although the *Viereck* Court's statement may be stirring, and though it could provide the foundation for a "civic duty" argument proscription, it is entirely dicta.  The Court specifically acknowledged that the "duty" argument was not the error that prompted reversal, but was simply another issue that "might well have placed the judgment of conviction in jeopardy."  *Id*. at 247.  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams*, 529 U.S. at 412; *Bailey,* 271 F.3d at 655.

Labeling an argument a "civic duty" argument does not render that argument prosecutorial misconduct.  The determination of impropriety requires going deeper; the deeper inquiry is whether the argument is irrelevant such that its only purpose would be to arouse passion and prejudice.  The fact that the argument invites the jurors to satisfy a civic duty is relevant to that analysis, but it is not dispositive.

In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), the Sixth Circuit Court of Appeals considered exactly how the "civic duty" analysis fits within the more fundamental inquiry into whether the prosecutor has attempted to appeal to the jurors' passion or prejudice:

> Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not *per se* impermissible.  *See Henderson v. United States*, 218 F.2d 14, 19–20 (6th Cir.), *cert. denied*, 349 U.S. 920 (1955).[2]  Our determination of whether comments are calculated to incite prejudice and passion in the jury is informed by the Supreme Court opinion in *Viereck*.
>
> *        *        *
>
> The remarks in the instant case are analogous to the comments adjudged inflammatory and prejudicial in *Viereck*.  The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers.  The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice.  The Supreme Court in *Viereck* framed the inquiry to incorporate both the purpose and effect of the comments.  In that case, in the light of contemporaneous events, which had great impact on the emotions and perceptions of jurors, the remarks "could only have . . . arouse[d] passion and prejudice."  *See id.* at 247.

---

[2] Our holding in *Henderson* and the result reached in *Alloway* reflect a general rule followed by other circuits as well.  In *United States v. Shirley*, 435 F.2d 1076 (7th Cir.1970), the Seventh Circuit stated that the prosecutor's closing remarks concerning

the increasing number of cars being stolen did not overstep the bounds of fairness and propriety and could not have worked a substantial injury to the defendant in denying him a fair trial because, even though the statements were not particularly relevant and had no bearing on the guilt or innocence of the defendant, the remarks did not contain an emotional appeal to the jurors' self-interest designed to arouse their prejudice against the defendant. *Id*. at 1079.

The Eighth Circuit has also stated, in a case where the prosecutor told the jurors that they were the public's last shield and the district court instructed the jury to disregard the remark, that unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.), *cert. denied*, 429 U.S. 1111 (1976). Similarly, the Eleventh Circuit, in *United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied*, 463 U.S. 1209 (1983), stated that appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not *per se* impermissible. However, the remarks complained of in *Kopituk* were found by the court to have approached the line demarcating impermissible comment calculated to incite the jury against the accused, but not to have crossed the line into the realm of impropriety and prejudice by directly suggesting that the jurors had personal stakes in the outcome of the case.

*Solivan*, 937 F.2d at 1151–52. The *Solivan* court went on to review several decisions where circuit courts of appeal had concluded that the argument crossed the line. For example in *United States v. Barker*, 553 F.2d 1013, 1024–25 (6th Cir. 1977), the court concluded that it was improper "for a prosecutor to suggest that unless the defendant was convicted it would be impossible to maintain 'law and order' in the jurors' community." *Solivan*, 937 F.2d at 1152. Additionally, the *Solivan* court referenced several cases where prosecutor's had gone too far in suggesting that their role as jurors permitted them to do something about drug trafficking in their community. *Solivan*, 937 F.2d at 1152–53.

The *Solivan* court contrasted those cases—cases where the jury was asked to look beyond the evidence against a particular defendant and consider the impact of their verdict on societal problems generally—with the decision in *United States v. Alloway*, 397 F.2d 105 (6th Cir. 1968). In *Alloway*, the court considered the propriety of the following argument:

47

You, the jurors, are called upon in this case to be the world conscience of the community.  And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate [armed robbery]. . . .

*Alloway*, 397 F.2d at 113.  The *Solivan* court explained why the "conscience of the community" argument in *Alloway* was acceptable while similar argument in *Barker* and *Solivan* was not:

> The comments by the prosecutor in *Alloway* and the comments complained of in the instant case are only vaguely similar.  The remarks in this case appear to us to have been deliberately injected into the proceedings to incite the jury against defendant.  Given the nature of this case, involving a cocaine transaction, and the wider social context which the prosecutor sought to bring to bear on the proceedings, the national drug problem, the purpose and effect of the comments could have only been to arouse passion and prejudice.  *See Viereck*, 318 U.S. at 247.  We determined that the statements made in *Alloway* were not deliberately injected into the proceedings to inflame the jury.  *See* 397 F.2d at 113.  Indeed, examined in the light of the nature of the case and the wider social context in which the case was prosecuted, it is clear that the government's statements in *Alloway* were devoid of the sort of inflammatory content inherent in the prosecutor's statements in this case precisely because there was no comparable specific wider context of national attention and concern present in *Alloway* pertaining to armed robbery.  The comments in *Alloway* did not attempt to compare or to associate the defendant with a feared and highly publicized group, such as drug dealers, as did the prosecutor in this case.  The prosecutor in *Alloway* did not go beyond a mere allusion to the general need to convict guilty people, as did the prosecutor in this case, and bring to bear upon the jury's deliberations the attendant social consequences of defendant's criminal conduct or urge the jury to convict an individual defendant in an effort to ameliorate society's woes.
>
> *        *        *
>
> In *Alloway*, we were presented with remarks by the prosecutor which alluded only to the general criminality of the defendant's conduct in robbing a bank and the general community need to convict guilty people.    The comments at issue in *Alloway* constituted a general plea which did not even specifically refer to the crime of armed robbery. Moreover, armed robbery was not and is not the specific focus of national

attention as is the drug problem.  In the instant case, we find that *Alloway* is inapposite because, in this case, the prosecutor went beyond the scope of the prosecutor's statements in *Alloway*, which constituted a mere innocuous reference to the community or societal need to convict guilty people.

*Solivan*, 937 F.2d at 1154–55.[16]  Neither *Solivan* nor *Alloway* are of particularly recent vintage, but just a few months ago, the Sixth Circuit relied on the analysis in *Solivan* and described it as "one of the most cited cases in this circuit regarding attorney appeals to the community conscience . . . ." *United States v. Hall*, 979 F.3d 1107, 1122 (6th Cir. 2020).

The Michigan Court of Appeals analysis is generally consistent with the case authority cited above:

> Defendant first argues that the prosecutor's statements about children appealed to sympathy and a sense of civic duty beyond the scope of the jury's duty to decide the facts of the case before them. Prosecutors "may not advocate that jurors convict a defendant as part of their civic duty." *People v Ackerman*, 257 Mich App 434, 452; 669 NW2d 818 (2003).  However, "allegations of prosecutorial misconduct must be examined and evaluated in context." *Id*.  We cannot concur with defendant's description of the prosecutor's arguments.  The prosecutor was making a larger point about predators and children.  These arguments were not intended to play on the emotions of the jury but rather were intended as arguments that defendant was a predator whose crimes were premeditated and that he took advantage of claimant and tried to take advantage of other girls.  While the prosecutor made several statements about children at the end of his closing argument, he did so in the context of making a broader point about the jury's job to determine the credibility of witnesses, arguing that the jury had the opportunity to believe the children that had testified rather than defendant.  Taken in context, the prosecutor's closing argument did not

---

[16] The *Solivan* court also noted that "[t]he district court in *Alloway* subsequently instructed the jury to base its verdict solely on the evidence and to consider the prosecutor's argument only as it corresponded with the evidence." *Solivan*, 937 F.2d at 1154.  But separate and apart from the remedial instruction, the Sixth Circuit concluded that the argument was not prosecutorial misconduct because it was not, by purpose or effect, intended to inflame the passion and prejudice of the jury.

improperly advocate that the jurors convict defendant as part of their civic duty.  Moreover, this Court has recognized that emotional language in a prosecutor's closing argument is "'an important weapon in counsel's forensic arsenal.'"  *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996), quoting *People v Mischley*, 164 Mich App 478, 483; 417 NW2d 537 (1987).  The prosecutor's remarks fell within the boundaries regarding the proper use of emotional language and did not deny defendant a fair trial or meet the threshold for reversal based on unpreserved error.

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1334.)

The undersigned concludes that, considered against the backdrop of the prosecutorial arguments in *Solivan* and *Alloway*, the prosecutor's argument in Petitioner's case is much more like the permissible *Alloway* argument than the impermissible *Solivan* argument.  The prosecutor was not calling upon the jurors to look outside of the specific actions for which Petitioner was being tried to address a larger societal problem, he was asking the jurors to look at the evidence regarding Petitioner's behavior and find Petitioner guilty.

Nonetheless, one could interpret a portion of the prosecutor's argument as an invitation to the jurors to credit the testimony of the CSC-1 and other victims of Petitioner's inappropriate behavior lest other children might not come forward.  That argument would invite the jurors to look outside of the facts of Petitioner's case to decide Petitioner's fate.  But that is clearly not the interpretation adopted by the Michigan Court of Appeals.  The appellate court's reading of the argument is not unreasonable.  It is not at all clear that the prosecutor's argument was an attempt, in purpose or effect, to inflame the passion and prejudice of the jury beyond whatever passion and prejudice might follow from the evidence that Petitioner committed the charged crimes and detrimentally impacted the lives of his victims.

Petitioner's suggestion that appealing to the jurors "civic duty" is *per se* prosecutorial misconduct is plainly wrong.  The prosecutor's argument here must be measured against the more general proscription against arguments intended to inflame passion and prejudice to the exclusion of proper consideration of the evidence.  Such a general proscription leaves state courts a lot of leeway in resolving constitutional claims.  Petitioner has failed to show that the state court's conclusion that the prosecutor's opening argument was proper is contrary to, or an unreasonable application of, clearly established federal law.  Moreover, the argument here falls well within the bounds of permissible argument as established by Sixth Circuit authority.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B.  Vouching

At the end of the prosecutor's rebuttal argument he argued: "[Claimant] is right.  [BH] is right."[17]  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1334.)  Petitioner argues that he argument constituted improper vouching for the victims' credibility.  The court of appeals disagreed:

> "[A] prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995).  However, "a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and a question of the defendant's guilt depends on which witnesses the jury believes."  *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004), citing *People v Flanagan*, 129 Mich App 786, 796; 342 NW2d 609 (1983).  Here the prosecutor was merely arguing that his witnesses were telling the truth.  He offered no evidence that he had any special insight into their credibility.  In fact, he went on to point out that it was the

---

[17] "Claimant" was the victim of the CSC-I charge; "BH" was the victim for the accosting charge of which Petitioner was acquitted.

province of the jury to ultimately determine who was telling the truth. On this record, we fail to glean any evidence of prosecutorial error relative to improper vouching. Accordingly, defendant is not entitled to relief on this issue.

(*Id.*)

"The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers:  such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18–19 (citing *Berger v. United States*, 295 U.S. 78, 88–89 (1935)).  Yet "a prosecutor may ask the jury to draw reasonable inferences of credibility from the evidence presented . . . ." *Willoughby v. White*, 786 F. App'x 506, 513 (6th Cir. 2019).  Viewed in isolation, the comments identified by Petitioner as objectionable appear to lean towards some form of impermissible vouching.  Viewed in context, as the Court must do, see *McQuarrie*, 817 F. App'x at 81 ("[C]ontext is key . . . ."), in light of the prosecutor's initial closing and the defense response, and as part of a larger rebuttal argument, the statements are simply fair comment on the evidence inviting the jurors to find the victim and BH credible.

The court of appeals' determination that the prosecutor's comments did not bear the hallmarks of impermissible vouching, but were instead fair comment on the evidence regarding credibility, is well-supported by the record.   Moreover, the appellate court's conclusion that the comments were not impermissible vouching or prosecutorial misconduct is not contrary to, or an unreasonable application of, the clearly established federal law of *Darden* or *Young*.   Accordingly, Petitioner is not entitled to habeas relief on this claim.

### C.      Shifting the burden of proof

Before the prosecutor stated that the victims were "right" he stated:

> So, simple, who do you believe?  Comes down to that.  Not DNA or concerts nights.  Corroboration.  Mister Howell got up and denied everything.  Produced not one witness to back up everything that he said.  [The CSC-I victim] is right.  [The accosting victim] is right.

(Trial Tr. IV, ECF No. 7-10, PageID.1063.)   Petitioner contends that by saying "[p]roduced not one witness to back up everything that he said[,]" the prosecutor effectively shifted the burden of proof.   The prosecutor may not shift the burden of proof to the defendant.   *Patterson v. New York*, 432 U.S. 197, 215 (1977).

The court of appeals rejected Petitioner's contention:

> Addressing defendant's burden shifting argument, "shifting the burden of proof or persuasion on an element of the crime charged violates due process."  *People v Fields*, 450 Mich 94, 113; 538 NW2d 356 (1995).  However, "attacking the credibility of a theory advanced by a defendant does not shift the burden of proof."  *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005).  Further, where a defendant "takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness . . . ."  *Fields*, 450 Mich at 110 (quotation marks and citation omitted).  Here, reading the prosecutor's statement in context, the prosecutor was merely commenting on the weaknesses in defendant's case and arguing that the evidence supported complainant and BH's versions of events.

Therefore, the prosecution did not improperly shift the burden of proof. *Id*. at 110-112. See also *McGhee*, 268 Mich App at 635. Moreover, the jury was instructed that defendant was presumed innocent until proven guilty beyond a reasonable doubt and that the lawyer's arguments were not evidence, and "[j]urors are presumed to follow the instructions of the court." *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011).

(Mich. Ct. App. Op., ECF No. 7-20, PageID.1335.)

"[W]hile a prosecutor may not comment on a defendant's silence, 'a prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the government's case' so long as the prosecutor does not suggest that the defendant bears the burden of proof." *Perkins v. McKee*, 411 F. App'x 822, 832 (6th Cir. 2011) (quoting *United States v. Clark*, 982 F.2d 965, 968–69 (6th Cir. 1993)). Moreover, immediately after the prosecutor uttered the purportedly objectionable sentence, the court instructed the jury that "lawyer's statements and the arguments . . . are not evidence" and "[t]he defendant is not required to prove his innocence or do anything." (Trial Tr. IV, ECF No. 7-10, PageID.1065–1066.) Jurors are presumed to follow their instructions. *See, e.g., Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

There is nothing in the prosecutor's comment that suggests that Petitioner carried the burden of proof and, even if the single objectionable sentence might have suggested so, the jurors were immediately disabused of that notion by the court's instructions just seconds later. Petitioner has failed to show that the Michigan Court of Appeals' rejection of his burden-shifting challenge to the prosecutor's closing argument is lacking in justification in any way, much less that the rejection is so lacking in justification that every fairminded jurist would disagree with it. Therefore, Petitioner is not entitled to habeas relief on this claim.

### D.    Ineffective assistance of trial counsel

Finally, Petitioner argues that his counsel was ineffective for failing to object to the prosecutor's misconduct during closing arguments.   The court of appeals rejected the claim because "[c]ounsel does not render ineffective assistance by failing to raise futile objections."  (Mich. Ct. App. Op., ECF No. 7-20, PageID.1335.)  That determination is in no way inconsistent with clearly established federal law. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).   Accordingly, Petitioner is not entitled to habeas relief on this claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.   A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.   Consequently, I have examined each of Petitioner's claims under the *Slack* standard.   Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Id.*   "A petitioner satisfies this standard by

demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

### **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:  March 4, 2021                        /s/ Phillip J. Green
                                             PHILLIP J. GREEN
                                             United States Magistrate Judge

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).